

1   **KAYE, ROSE & PARTNERS, LLP**
2   Bradley M. Rose, Esq. (126281)
    brose@kayerose.com
3   André M. Picciurro, Esq. (239132)
    apicciurro@kayerose.com
4   1801 Century Park East, Suite 1500
    Los Angeles, California 90067
I/S 21   5   Telephone: (310) 551-6555
6   Facsimile: (310) 277-1220

7   Attorneys for Plaintiff,
    ORIENT SPIRIT NAVIGATION LIMITED
8

9               UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11  ORIENT SPIRIT NAVIGATION          Case No.
    LIMITED,                          **CV 14-0572 PA-JCx**
12                                    **IN ADMIRALTY**
                Plaintiff,
13                                    **VERIFIED COMPLAINT**
14      v.

15  ANL CONTAINER LINE PTY
    LIMITED,
16
                Defendant.
17

18          Plaintiff ORIENT SPIRIT NAVIGATION LIMITED (hereinafter

19  "ORIENT SPIRIT" or "plaintiff"), by its undersigned counsel, hereby files its

20  Verified Complaint against Defendant ANL CONTAINER LINE PTY

21  LIMITED (hereinafter "ANL" or "defendant"), and pleads as follows:

22          **I.      JURISDICTION, VENUE, AND PARTIES**

23          1.      This is an admiralty and maritime claim within the meaning of Rule

24  9(h) of the Federal Rules of Civil Procedure in that it involves the breach of a

25  maritime contract (Charter). This Complaint and the claims herein set forth also

26  fall under this Court's Admiralty Jurisdiction pursuant to 28 U.S.C. Section

27  1333, and is brought under the provisions of Rule B of the Supplemental Rules

28  ///

for Admiralty or Maritime Claims and Asset Forfeiture, Federal Rules of Civil Procedure and Local Admiralty ("Supplemental Admiralty Rules").

2.     At all times material hereto, plaintiff ORIENT SPIRIT was and still is a foreign business entity duly organized and existing under the laws of Liberia.

3.     At all times material hereto, Defendant ANL, was and still is a foreign business entity duly organized and existing under the laws of Australia.

4.     Venue lies within the Central District of California pursuant to the provisions of 28 U.S.C. Section 1391(b) and Rules B and E of the Supplemental Admiralty Rules, in that an asset of Defendant that may be attached by process of maritime attachment and garnishment under Rule B of the Supplemental Admiralty Rules as pled in Section III of this Verified Complaint is within this Honorable Court's jurisdiction.

## II.     THE SUBSTANTIVE CLAIMS

### First Cause of Action – Rule B Application of ORIENT SPIRIT

5.     Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 4, as though fully set forth herein.

6.     Plaintiff ORIENT SPIRIT, Owners of M/V ANL KOKODA (the "Vessel") (presently M/V ORIENT SPIRIT), chartered the Vessel to Defendant ANL by a time Charterparty dated November 24, 2006 (hereinafter "Charterparty").  A copy of the Charterparty with addenda is attached hereto as **Exhibit 1.**  The Charterparty is a maritime contract.

### A.     Breaches of Charterparty's Redelivery Provisions

7.     Clause 50 of the Charterparty governing ORIENT SPIRIT's obligations to purchase remaining bunkers (marine fuel) upon redelivery at the end of the Charterparty period states: "… Owners to take over bunkers on redelivery.  Prices to be based on nearest Platts' Oilgram bunkerwire date/port of delivery respectively redelivery."  In breach of this clause, ANL deducted sums for bunkers remaining onboard at redelivery which exceeded the value of the

Kaye, Rose & Partners LLP

bunkers based on the nearest Platts' Oilgram bunkerwire for the port of redelivery. ANL used figures of US$750pmt for Heavy Fuel Oil ("HFO") HFO and US$987.50pmt for Marine Diesel Oil ("MDO"), whereas the applicable prices were US$669pmt for HFO and US$966.50 for MDO. (See ANL Statement attached hereto as **Exhibit 2** and applicable Platts' Oilgram bunkerwire attached hereto as **Exhibit 3**.

8. Clause 83 states: "The Charterers have the right to deduct from the hire payment the Owner's expenses supported by the relevant vouchers." In breach of this clause, ANL deducted the sum of $10,000 for alleged ORIENT SPIRIT expenses but have not supported this deduction with vouchers.

9. As a result of ANL's breaches of the Clauses 50 and 83 of the Charterparty, ORIENT SHIPPING suffered damages in the amount of US$34,962.01 as reflected in the Final Hire Statement attached hereto as **Exhibit 4**.

### B. Breach of Charterparty's Sale Provision

10. Clause 84 of the Charterparty states: "The vessel shall not be sold during the Charter period without the Charterers' prior approval of the potential new Owners which not to be unreasonably withheld."

11. On March 11, 2011, ORIENT SPIRIT advised ANL of a potential sale of the Vessel and asked for ANL's approval. (Correspondence dated March 11, 2011 from ORIENT SPIRIT's representative to ANL's representative is attached hereto as **Exhibit 5**.) The details of the proposed sale, including the purchase price of US$7,300,000, had been agreed and recorded in a recap dated March 3, 2011 and included a delivery window of March 15 to April 15, 2011. (Recap is attached hereto as **Exhibit 6**.)

///

///

///

Kaye, Rose & Partners LLP

12.    ANL failed to respond to ORIENT SPIRIT's request for approval, and ORIENT SPIRIT requested approval a second time on March 22, 2011. (Correspondence dated March 22, 2011 from ORIENT SPIRIT's representative to ANL's representative is attached hereto as **Exhibit 7**.)

13.    On March 23, 2011, ANL responded that it would not approve the sale unless ORIENT SPIRIT provided security for a claim asserted by ANL with respect to a crane breakdown in the amount of $350,000 without any details or documentary support for such figure.

14.    ORIENT SPIRIT proposed security in the form of a guarantee by its Vessel managers and asked for details and supporting documentation for ANL's claimed amount.  (Correspondence dated March 30, 2011 from ORIENT SPIRIT's representative to ANL's representative is attached hereto as **Exhibit 8**.)

15.    On April 7, 2011, ANL rejected ORIENT SPIRIT's offer of a guarantee by its Vessel managers and demanded a bank guarantee of the US$350,000, or deposit of same into an escrow account.

16.    On April 14, 2011, ORIENT SPIRIT proposed security in the form of a letter of undertaking (LOU) issued by its P&I Club and again requested details and support for the claimed amount of US$350,000.  (Correspondence dated April 14, 2011 from ORIENT SPIRIT's representative to ANL's representative is attached hereto as **Exhibit 9**.)

17.    On April 20, 2011, ANL provided ORIENT SPIRIT with draft wording for an LOU and a draft novation agreement for the Charterparty and set out a claim for US$383,000 (more than the original demand for security).  Also, the language in the LOU was unreasonable.

///

///

///

///

Kaye, Rose & Partners LLP

18.     ORIENT SPIRIT endeavored to agree to a reasonable novation agreement and LOU with ANL; however, on or about May 12, 2011, the potential buyers rejected the Vessel on the grounds that ANL had delayed acceptance of the sale.  At the same time, the potential buyers offered US$6,200,000 for the Vessel.

19.     ANL breached its obligation to not unreasonably withhold approval for a sale by failing to:

a.     respond to ORIENT SPIRIT's requests within a reasonable period, despite the obvious urgency of the matter;

b.     consent to the sale absent any objection to the identity of the proposed buyers or doubts as to the proposed buyers;

c.     consent to the sale by conditioning same on security for an alleged claim; and

d.     provide details or supporting documentation of its claimed figures for which it demanded security.

20.     As a result of ANL's breach of Clause 84 of the Charterparty, ORIENT SPIRIT was damaged in the amount of US$1,100,000 which represents the proposed sale price of the Vessel (US$7.3M) prior to ANL's unreasonable withholding of approval minus the value of the vessel (US$6.2M) after the proposed sale collapsed due to ANL's breach.

**C.     Arbitration in London**

21.     Pursuant to the terms of the Charterparty, disputes between ORIENT SPIRIT and ANL are to be submitted to binding arbitration in London with English law to apply.  The parties are currently engaged in arbitration in London.

22.     This action is an ancillary proceeding, brought in order to obtain jurisdiction over ANL and to obtain security for ORIENT SPIRIT's claims in aid of the London arbitration proceedings as set forth herein.

Kaye, Rose & Partners LLP

23.     Interest, costs, and attorneys' fees are routinely awarded to the prevailing party under English Law (namely, Section 63 of the Arbitration Act of 1996). Section 49 of the Arbitration Act of 1996 entitles ORIENT SPIRIT to seek and recover interest on the sum of its damages as asserted above.

24.     As best as can be currently estimated, ORIENT SPIRIT expects to recover the following sums in the London Arbitration:

| | | |
|---|---|---|
| a. | Principal Claim: | US$1,134,962.01 |
| b. | Estimated Interest on Principal Claim: *4 years at 4.25%, compounded quarterly* | US$ 209,108.10 |
| c. | Estimated Attorneys' Fees: | US$ 200,000.00 |
| d. | TOTAL: | US$1,544,070.11 |

25.     Therefore, ORIENT SPIRIT's total claim for ANL's acts, omissions, and breaches of the Charterparty is, in the aggregate, US$1,544,070.11.

## III.    APPLICATION FOR ATTACHMENT UNDER SUPPLEMENTAL ADMIRALTY RULE B

26.     Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 25, as though fully set forth herein.

27.     Defendant ANL is not present and cannot be found in the Central District of California within the meaning of Rule B of the Supplemental Admiralty Rules. See Attorney Declaration filed contemporaneously herewith, ¶¶ 2-7.     However, ANL is believed to have or will have during the pendency of this action certain assets, accounts, freights, monies, charter hire, credits, effects, bunkers, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, ANL within this District held by ANL or various other parties, as garnishees.

///

Verified Complaint                                                    Case No.:

28.    Specifically, and pursuant to a separate time charter agreement, the M/V WINTER D is on time charter to Defendant ANL and will be calling on the Port of Los Angeles on January 25, 2014.

29.    Plaintiff believes that the bunkers, or payment for the bunkers, onboard M/V WINTER D are assets of Defendant ANL which are or will be located in this District.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays as follows:

a.  That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction, issue against Defendant ANL and said defendant be cited to appear and answer the allegations of this Complaint;

b.  That if Defendant ANL cannot be found in this District, that all of its respective property within this district up to an amount of $1,544,070.11, including the bunkers onboard M/V WINTER D, be attached and seized pursuant to Supplemental Admiralty Rule B.

c.  That a judgment be entered against Defendant ANL in the sum of US$1,134,962.01, together with interest, costs, and attorneys' fees.

d.  That the Court grant such other and further relief as it deems just, equitable, and proper.

*Respectfully submitted,*

Dated: January 24, 2014

KAYE, ROSE & PARTNERS, LLP

By: _____

André M. Picciurro
Attorneys for Plaintiff ORIENT
SPIRIT NAVIGATION LIMITED

Kaye, Rose & Partners LLP

Code name    "YPE 93"
Recommended by:
The Baltic and International Maritime Council(BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

HARRY ROGLIANO SALLES
S.A.S. au Cap. 125,500 €
11, Boulevard Jean Mermoz
92522 NEUILLY S/ SEINE CEDEX
Tél. : 01 41 92 12 34



## TIME CHARTER®                    SECOND ORIGINAL
New York Produce Exchange Form
Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in *Neuilly* ......................................................................... | 1 |
| this *24th* ........................................................... day of .. *November* ............................... 19 *2006* ......... | 2 |
| | |
| Between Messrs. *RUSSEL HOLDINGS CORP.* ................................................................................. | 3 |
| .................................................. *CONTAINER LINE PTY LTD* ................................................................. | 4 |
| Owners of the Vessel described below, and Messrs. *ANL, Melbourne Australia* .............................. | 5 |
| .................................................................................................................................................................... | 6 |
| .................................................................................................................................................................... | 7 |
| Charterers. | 8 |
| | |
| Description of Vessel | 9 |
| | |
| Name *ANL KOKODA ex ORIENT SPIRIT (see clause 78 for full description)* -Flag- .................... -Built- ............... -(year)- | 10 |
| Port and number of Registry ..................................................................................................................... | 11 |
| Classed .......................................................... in ............................................................................. | 12 |
| Deadweight .............................................................. long*/metric* tons (cargo and bunkers, including freshwater and | 13 |
| stores not exceeding ............................................ long*/metric* tons) on a salt water draft of ........................... | 14 |
| on summer freeboard. | 15 |
| Capacity ................................................................ cubic feet grain ............................... cubic feet bale space. | 16 |
| Tonnage ...................................................... GT/GRT. | 17 |
| Speed about ................................................... knots, fully laden, in good weather conditions up to and including maximum | 18 |
| Force ................. on the Beaufort wind scale, on a consumption of about ............................................ long*/metric* | 19 |
| tons of .......................................................................................................................... | 20 |
| | |
| * Delete as appropriate. | 21 |
| For further description see Appendix "A" (if applicable) | 22 |
| | |
| **1.    Duration** | 23 |
| | |
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| of *12 months time charter with upto more or less 30 days in Charterers' option starting as from passing Cairns* | 25 |
| .................................................................................................................................................................... | 26 |
| .................................................................................................................................................................... | 27 |
| .................................................................................... within below mentioned trading limits. | 28 |
| | |
| **2.    Delivery** | 29 |
| | |
| The Vessel shall be placed at the disposal of the Charterers at *when and where ready Wai Gao berth, Shanghai at* | 30 |
| *any time day or night saturdays, sundays and holidays included* ................................................................... | 31 |
| .................................................................................................................................................................... | 32 |
| .............................................................................................. The Vessel on her delivery | 33 |
| shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted | 34 |
| for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear | 35 |
| simultaneously. | 36 |
| | |
| The Owners shall give the Charterers not less than .......................................... days notice of expected date of | 37 |
| delivery. | 38 |
| | |
| | 39 |

Exhibit 1
Page 9

**3.  On-Off Hire Survey** - *see clause 46*

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~ 40
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~ 41
~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ 42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ 43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ 44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ 45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ 46
~~On-hire survey shall be on Charterers' time and off hire survey on Owners' time.~~ 47

**4.  Dangerous Cargo/Cargo Exclusions** - *see also clause 70* 48
*Cargo to consist only of lawful containers in accordance with Vessel's IMO dangerous cargo certificates.*
*Breakbulk cargo can be loaded on flatracks and/or containers.*

~~(a)  The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,~~ 49
~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~ 50
~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~ 51
~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~ 52
~~pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~ 53
~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~ 54
.......................................................................................................................... 55
.......................................................................................................................... 56
.......................................................................................................................... 57
.......................................................................................................................... 58
.......................................................................................................................... 59
.......................................................................................................................... 60
.......................................................................................................................... 61
.......................................................................................................................... 62
.......................................................................................................................... 63
.......................................................................................................................... 64

~~(b)  If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~..........................................................tons and the Charterers provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

**5.  Trading Limits** 70

The Vessel shall be employed in such lawful trades *always* between safe ports and safe places, *safe* 71
*berths, safe anchorages, worldwide trade, always afloat always within International Navigating Limits. Intended trade*
*but without guarantee Australia/New Zealand/Papua New Guinea. No trading in rivers with bars.*
within .......................................................................................................................... 72
.............................................................................................................., excluding 73
*Ethiopia, Eritrea, Somalia, Zaire, Angola including Cabinda, Liberia including Monrovia, Sierra Leone, Canada,* 74
*Cuba, Orinoco river, Amazon river, Parana river, Turkish Occupied Cyprus, Abkazia, Israel, Iraq, Yemen,* 75
*Russian Far East, Cambodia, North Korea, Sweden, Finland, Norway, Iceland, Arctic regions or any places where* 76
*U.N. embargo or sanctions existing, war or war-like zones.* ~~as the Charterers shall direct.~~

*When vessel is trading to US ports Charterers to undertake the following at their expenses:*

*1)That an International Carrier Bond (including APIS purposes ) in place in the name of disponent Owners and the*
*vessel will be covered during trading in US waters by the Charterers for all the period of time charter.*
*2) That Charterers will fulfill the requirement for Automated Manifest System,and they are in posession of a SCAC*
*code.*
*3) That appointed agents will submmit to USCG NVMC the ENOA/D for this vsl free of charge to the Owners.*

**6.  Owners to Provide** - *see clause 47* 77

Exhibit 1
Page 10

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and equipment for and during the service, and have a full complement of officers and crew. *Lubrication oil needed on board the ship, always to be for Owners' account.*

**7. Charterers to Provide**

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages, towages, agencies, commissions, consular charges (except those pertaining to individual crew members or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while the Vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six months or more.~~

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in their time.

**8. Performance of Voyages** - *see clause 48*

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance with the Vessel's crew. The Master shall be conversant with the English language and (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and the Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense, under the supervision *and responsibility* of the Master *as far as vessel's seaworthiness is concerned.*

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

**9. Bunkers** - *see clause 50*

~~(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with: ......................................................long*/metric* tons of fuel oil at the price of ........................................per ton; ..............................................tons of diesel oil at the price of.........................................per ton. The vessel shall be redelivered with: ..............................................tons of fuel oil at the price of ........................................per ton; ......................................................tons of diesel oil at the price of...................................................per ton.~~

~~* Same tons apply throughout this clause.~~

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) as set out in *clause 78* ~~Appendix A~~.

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

**10. Rate of Hire/Redelivery Areas and Notices**

The Charterers shall pay for the use and hire of the said Vessel at the rate of $ *USD 6700.- (six thousand seven*

*no time charter hire until apt hue, then rate to be used secc until*

hundred) per day pro rata including overtime *no time charter hire until passing Cairns* when passing Cairns the new 12    126
months charter to commence. For the positioning trip Charterers to pay only the bunkers consumption.
U.S. currency, daily, or $ .................................................................... U.S. currency per ton on the Vessel's total deadweight    127
carrying capacity, including bunkers and stores, on .. summer freeboard, per 30 every 15 (fifteen) days in advance,    128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part    129
of a day month; hire shall continue until the hour of the day of her redelivery in like good order and condition,    130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at one safe port in Charterers' option within    131
Australia/New Zealand or in Charterers' option Port Kelang/South Japan range any time day or night sundays, holidays    132
included  ....................................................................................................................................................    133
............................................................................................................................ unless otherwise mutually agreed.    134

The Charterers shall give the Owners not less than 30/25/20/15/10/7/5 days approximate and 3/2/1 days definite    135
notice of the Vessel's
expected date and probable port of redelivery.    136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be    137
adjusted to GMT.    138

11.    Hire Payment    139

(a)    Payment    140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in    141
Owners' nominated bank account, viz. ..................................................................................................................    142
HSBC BANK PLC, ........................................................................................................................................    143
93 AKTI MIAOULI ..........................................................................................................................................    144
PIRAEUS BRANCH,    145
GREECE
SWIFT: MIDLGRAA
IN FAVOUR OF: RUSSEL HOLDINGS CORP.
I.B.A.N.: GR88 0710 0010 0000 0104 8792 036
in
.................................................................... currency, or in United States Currency, in funds available to the    146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day-by-day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.    152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.    158

(b)    Grace Period    159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
three ...................... clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those three ...................., days following the Owners' notice, the payment shall    163
stand as regular and punctual.    164

Failure by the Charterers to pay the hire within three, ...................... days of their receiving the Owners' notice as    165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.    166

(c)    Last Hire Payment    167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and    169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking    170

Exhibit 1
Page 12

into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for | 171
the Owners' account before redelivery. ~~Should same not cover the actual time, hire is to be paid for the~~ | 172
~~balance, day by day, as it becomes due.~~ When the Vessel has been redelivered, any difference is to be | 173
refunded by the Owners or paid by the Charterers, as the case may be. *Final accounts to be settled latest within* | 174
*three months after vessel's redelivery date.*

(d)   *Cash Advances* | 175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required | 176
by the Owners, subject to 2 1/2 percent commission and such advances shall be deducted from the hire. | 177
The Charterers, however, shall in no way be responsible for the application of such advances. | 178

**12.   Berths** | 179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that | 180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat | 181
at any time of tide. | 182

**13.   Spaces Available** | 183

(a)   The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can | 184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the | 185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle, | 186
apparel, furniture, provisions, stores and fuel. | 187

(b)   *Any deck cargo is carried at Charterers' risk and expense under Master's direction.*~~In the event of deck cargo~~ | 188
~~being carried, the Owners are to be and are hereby indemnified by the~~
~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~ | 189
~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~ | 190

**14.   Supercargo and Meals** - *see clause 49* | 191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers' | 192
risk and see that voyages are performed with due despatch. He is to be furnished with free | 193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of | 194
*USD 9.-* ................................... per day. ~~The Owners shall victual pilots and customs officers, and also, when~~ | 195
~~authorized by the Charterers or their agents, shall victual tally clerks, stevadore's foreman, etc.,~~ | 196
~~Charterers paying at the rate of~~ .............................................................................~~per meal for all such victualling.~~ | 197

**15.   Sailing Orders and Logs** | 198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing | 199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine | 200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the | 201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, | 202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts | 203
required by the Charterers shall be in the English language. | 204

**16.   Delivery/Cancelling** | 205

If required by the Charterers, time shall not commence before *30th October 2006.*.......................... and should the | 206
Vessel not be ready for delivery on or before *04th November 2006.*............~~but not later than~~ ........................ hours, | 207
the Charterers shall have the option of cancelling this Charter Party. | 208

*~~Extension of Cancelling~~* | 209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~ | 210
~~for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~ | 211
~~the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~ | 212
~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~ | 213
~~cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two~~ | 214

Exhibit 1
Page 13

~~days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date~~   215
~~of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the~~   216
~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~   217
~~in accordance with this Clause.~~   218

**17.   Off Hire**   219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency   220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the   221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,   222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless   223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or   224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of   225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back   226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident   227
to the cargo ~~or where permitted in lines 257 to 258 hereunder,~~ the hire is to be suspended from the time   228
of her deviating or putting back until she is again in the same or equidistant position from the destination   229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'   230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,   231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses   232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be   233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and   234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be   235
deducted from the hire.   236

**18.   Sublet**   237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of   238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this   239
Charter Party.   240

**19.   Drydocking**   241

The Vessel was last drydocked ..................................................................................................   242

~~*(a)   The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~   243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~   244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~   245

*(b)   Except in case of emergency no drydocking shall take place during the currency of this Charter   246
Party.   247

* Delete as appropriate   248

**20.   Total Loss**   249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or   250
being last heard of) shall be returned to the Charterers at once.   251

**21.   Exceptions**   252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the   253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always   254
mutually excepted.   255

**22.   Liberties**   256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels   257
in distress, and to deviate for the purpose of saving life and property.   258

**23.   Liens**   259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due   260

Exhibit 1
Page 14

under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. 261 262 263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time. 264 265 266 267

24.   Salvage 268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion. 269 270

25.   General Average 271

General average shall be adjusted according to York-Antwerp Rules 1994~~1974, as amended 1990,~~ or any subsequent modification thereof, in *London*...................................... and settled in .....*United States* ...................... currency. 272 273 274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason Clause" as per Clause 31. 275 276 277 278

Time charter hire shall not contribute to general average. 279

26.   Navigation 280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account. 281 282 283

27.   Cargo Claims 284

Cargo claims ~~as between the Owners and the Charterers~~ shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent modification or replacement thereof. 286 287

28.   Cargo Gear and Lights 288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows; *see clause 78* ...................................................................................................................... ...................................................................................................................... ...................................................................................................................... providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also provide on the Vessel for night work lights as on board, but all additional lights over those on board shall be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire. 289 290 291 292 293 294 295 296 297 298 299 300 301 302

29.   Crew Overtime 303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents, the Charterers shall pay the Owners, concurrently with the hire...................................................per month or pro rata.~~ 304 305 306

30.   Bills of Lading 307

Exhibit 1
Page 15

(a)   The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the Master, ~~with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.~~ — 308 / 309 / 310

(b)   All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master at their request. — 311 / 312 / 313 / 314

(c)   Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for any loss, damage, expense or delay howsoever caused." — 315 / 316 / 317

31.   Protective Clauses — 318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading or waybills issued hereunder: — 319 / 320

(a)   CLAUSE PARAMOUNT — 321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as *or the Hamburg Rules where compulsorily* applicable, or such other similar national — 322 / 323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further." — 324 / 325 / 326 / 327 / 328

and — 329

(b)   BOTH-TO-BLAME COLLISION CLAUSE — 330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other non-carrying ship or her owners as part of their claim against the carrying ship or carrier. — 331 / 332 / 333 / 334 / 335 / 336 / 337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact." — 338 / 339 / 340

and — 341

(c)   NEW JASON CLAUSE — 342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. — 343 / 344 / 345 / 346 / 347 / 348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." — 349 / 350 / 351 / 352

and — 353

(d)   *If vessel is trading to USA following clause to apply :* U.S. TRADE - DRUG CLAUSE — 354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the — 355

Exhibit 1
Page 16

Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel;

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up the bails to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel."

and

(e) WAR CLAUSES

"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces).

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of *to be advised*.......................................... In addition, the Owners may purchase and the Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, the Vessel shall not be required to enter or remain at any such port or zone.
*In case the Charterers direct the vessel to places where EWRIP exists, premiums to be for Charterers' account and to be paid upon presentation of same by fax. Underwriters' original invoices to be sent to the Charterers.*

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account."

**32. War Cancellation**

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: *United States of America, United Kingdom, France, People's Republic of China, Russsia, Germany, Canada, Netherlands, Belgium, country of vessel's flag*
..................................................................................................................................................
..................................................................................................................................................
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.

**33. Ice**

~~The Vessel shall not be required to enter or remain in any icebound port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, construction and ice class.~~ 404 405 406 407 408 409

### 34.   Requisition 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party. 411 412 413 414 415

If the period of requisition exceeds one.................................................... months, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party. 416 417

### 35.   Stevedore Damage - *see clause 51* 418

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.~~ 419 420 421 422 423

~~(a)   In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.~~ 424 425 426 427

~~(b)   Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.~~ 428 429 430 431 432

### 36.   Cleaning of Holds - *see clause 52* 433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by local regulations, at the rate of.................................................... per hold.~~ 434 435 436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver the Vessel with unclean/unswept holds against a lumpsum payment of........................................in lieu of cleaning.~~ 437 438 439

### 37.   Taxes 440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the Vessel or the Owners). 441 442 443 444

### 38.   Charterers' Colors 445
*Charterers have the option to rename the vessel, subject to the authorities approval. Prior to redelivery Charterers to rename the vessel to Owners' given name. Both renamings to be at Charterers' time and expense.*

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers shall be for Charterers' account. 446 447 448 449

Exhibit 1
Page 18

**39.   Laid Up Returns**                                                                                   450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their   451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum   452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.   453

**40.   Documentation**                                                                                     454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the   455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial   456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'   457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate   458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.   459

**41.   Stowaways**                                                                                         460

(a)    (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining   461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the   462
Charterers.   463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained   464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the   465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers   466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all   467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all   468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account   469
and the Vessel shall remain on hire.   470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to   471
sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a   472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the   473
Vessel.   474

(b)    (i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained   475
access to the Vessel by means other than secreting away in the goods and/or containers shipped   476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including   477
fines, shall be for the Owners' account and the Vessel shall be off hire.   478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel   479
by means other than secreting away in the goods and/or containers shipped by the Charterers,   480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel   481
is released and at their expense put up bail to secure release of the Vessel.   482

**42.   Smuggling**                                                                                         483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any   484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.   485

**43.   Commissions**                                                                                       486

A commission of *1.25* percent is payable by the Vessel and the Owners to *Barry Rogliano Salles, Neuilly - France*   487
.................................................................................................................   488
.................................................................................................................   489
.................................................................................................................   490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.   491

**44.   Address Commission**                                                                                492

An address commission of..............................percent is payable to.........................................   493
.................................................................................................................   494

Exhibit 1
Page 19

........................................................................................................................................ 495
........................................................................................................on hire earned and paid under this Charter. 496

497

46.   Arbitration

(a)   NEW YORK
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and   498
subject to U.S. Law:   499
500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their   501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this   502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with   503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of   504
Maritime Arbitrators Inc.   505

For disputes where the total amount claimed by either party does not exceed US $........................................** 506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society   507
of Maritime Arbitrators Inc.   508

(b)   LONDON   509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree   510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business   511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,   512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No   513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as   514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder   515
shall be governed by English Law.   516

For disputes where the total amount claimed by either party does not exceed US $ 50,000 ..............................** 517
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime   518
Arbitrators Association.   519

* Delete para (a) or (b) as appropriate   520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions   521
of this clause shall have full force and remain in effect.   522

If mutually agreed, clauses 46.............................. to 84.........................., both inclusive, as attached hereto are fully   523
incorporated in this Charter Party.   524

This Charter Party is a computer generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents
(USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In
the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved
document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or
damage caused as a result of any discrepancies between the original approved document and this document.

Exhibit 1
Page 20

APPENDIX "A"

To Charter Party dated ............................................................................................ 526
Between ...................................................................................................... Owners 527
and .......................................................................................................... Charterers 528

Further details of the Vessel: ................................................................................ 529
.......................................................................................................................... 530

Exhibit 1
Page 21

**RIDER CLAUSES TO CHARTER PARTY OF**
**M.V. "ANL KOKODA "**
**DATED NEUILLY, 24th NOVEMBER 2006**

**Clause 46**
A joint on and off hire survey to be held at first load respectively last discharge port.
On hire survey in Owners' time, off hire survey in Charterers' time, costs of the same
to be equally shared between both parties.

**Clause 47**
Owners to supply all necessary fittings and full set of lashing/securing material to
safely load and carry a full cargo of containers.

Owners to provide valid deratisation certificate on delivery of the vessel and if this does
not cover the whole period of time charter and fumigation is necessary, cost of same
and detention to be for Owner's account, unless otherwise stated in Clause 7.

**Clause 48**
Customary assistance with the vessel's crew as laid down in Clause 8 of this
Charter Party implicitly means all normal functions of the crew same as when
trading for Owners' own account and shall include but not be limited to:

-   Opening and closing of weatherdeck and tweendeck hatches
-   Removing and replacing beams
-   Preparing hatches for loading and discharging
-   Cleaning of holds and storing of cargo handing equipment to make the vessel
    fit for the next cargo
-   Supervision of loading, stowage and discharging
-   Collection and storage of container fittings and lashing materials in the
    appropriate places to be ready for immediate use
-   Checking of lashings whilst at sea and same to be tightened, if required
-   Checking/supervising that reefer containers are properly functioning at the
    correct temperature whilst en route (see paragraph B below)
-   Master and Officers to cooperate with Charterers in all respects and to assist
    Charterers in planning the loading/discharging operations in order to obtain
    best possible and optimal stowage
-   All above provisions being subject to the permission and/or regulations of the
    respective port(s) of call.
-   Removing ice on deck, cargo spaces - to be performed by crew to be settled
    against a lumpsum to be agreed directly between Charterers' operations
    department and Master.

In case of reefer containers are being carried under refrigeration the vessel's crew
regularly supervise the containers are properly functioning at the correct
temperature, Owners to ensure that full and correct deck and refrigeration logs are
kept during each voyage and furnish Charterers, when required, with a true copy
of daily logs.

1

Exhibit 1
Page 22

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA "
DATED NEUILLY, 24th NOVEMBER 2006

**Clause 48 – continued**
In case of malfunction, the Master immediately; when discovered to notify Charterers and/or their agents and to render all possible assistance with vessel's engineers in repairing malfunctioning reefer containers whilst en route to maintain the temperature of the reefers at the required levels, provided spare parts are available. In case such repair work is performed and unless malfunctioning is resulting from lack of electrical power from the vessel, Charterers paying US$ 15.00 per man/hour to be settled directly between Charterers/Master/crew members. In such case crew members are considered to act as Charterers' servants. Charterers will supply repair kit and/or necessary spare parts as required.

Vessel's crew to assist in lashing and unlashing of containers, if required by the Charterers and provided allowed by local port/union regulations. If crew is giving such work as Charterers' servants, Charterers to pay US$ 3.00 per unit (20' or 40') for lashing and US$ 2.00 per unit (20' and 40') for unlashing to the Master. If within the course of first month the remuneration given is proven insufficient, Owners and Charterers to agree directly a fair lumpsum remuneration for above mentioned services.

**Clause 49**
Charterers to pay Owners per month US$ 900.- (nine hundred US Dollars) payable with hire for representation/meals and communication expenses. This figure to be reviewed after one month trading.

**Clause 50**
Vessel to be delivered with bunkers as onboard sufficient to safely reach next bunkering port. Vessel to be redelivered with about same quantities.

Charterers to take over bunkers on delivery together with second hire payment and Owners to take over bunkers on redelivery.

Prices to be based on nearest Platts' Oilgram bunkerwire date/port of delivery respectively redelivery.

**Clause 51**
Notwithstanding the addition in Clause 8 Charterers to remain responsible for any damages done to the vessel or her fittings caused by the stevedores during loading and discharging operations provided:

A.    The Master notifies Charterers and their agents immediately by telegram or in writing of any damage sustained by the vessel so that a claim can be made against the responsible party.

B.    The damage is specified in detail. Damage not involving seaworthiness and/or cargoworthiness for which Charterers are liable shall be repaired as soon as possible either prior or after redelivery, but not later than next dry dock in

2

Exhibit 1
Page 23

# RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "ANL KOKODA"
### DATED NEUILLY, 24ᵗʰ NOVEMBER 2006

**Clause 51 – continued**
Owners' time, provided this does not interfere with Owners' repair works, and/or by vessel's crew; otherwise no notice shall be accepted.

C.  Stevedoring damages, if any, shall be immediately reported by the Master directly to stevedores upon occurrence in order to try to get signed evidence of the damage.

Any stevedore damages remaining un-repaired upon redelivery shall be listed in the redelivery certificate.

Before concluding a repair contract for stevedore damages, Owners shall submit to Charterers for their approval a quotation for the repair costs from their contractor. If such quotations not acceptable to Charterers, they shall appoint a contractor of their choice for the repairs and settle same directly, at Owners' Classification Society satisfaction.

Alternatively, Owners and Charterers can agree with an amount for such damage, if necessary on the basis of a joint survey and payment of such amount to Owners' release Charterers from further responsibility for the corresponding damage.

Damage involving seaworthiness, cargoworthiness and/or Class shall be repaired without any delay by Owners and/or Charterers at Charterers' time and expense prior to vessel's departure from port of occurrence, and according to Classification Society recommendations, if applicable.

**Clause 52**
No lumpsum to be paid to the Owners by the Charterers in lieu of hold cleaning, Vessel to be delivered/redelivered with clean/odour free holds. ~~Crew to undertake when requested by the Charterers the cleaning of the holds after discharging operations or during ballast voyage(s).~~

**Clause 53** – Deleted

**Clause 54**
Charterers or their agents have the option of holding an inspection of the vessel at any time and Owners/Master to give every facility and assistance in carrying out such inspection.

**Clause 55**
Owners guarantee that vessel is always safe in ballast and it is agreed that if any solid ballast is required, all expenses for same, including time used for loading and discharging as well as bunkers consumed during such period to be for Owners' account.

3

Exhibit 1
Page 24

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA"
DATED NEUILLY, 24th NOVEMBER 2006

**Clause 56**
Vessel's equipment and all certificates/ship's documents must comply with the laws and regulations of the countries in which vessel may be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates about her Class/radio station etc. to comply with such regulations. Charterers to be permitted to examine all the ship's certificates and/or Photostat same at any time upon request.

Master to produce to Charterers or their delegates, full set of certificates as requested.

Vessel to be tendered free of beetles on delivery and Owners also to supply valid deratisation certificate.

In the event that any of the above mentioned certificates does not cover the whole period of this Charter all costs, losses, etc. resulting from Owners' failure to produce such valid certificate to be for Owners' account and Charterers may suspend hire for the time thereby lost.

**Clause 57** - Deleted

**Clause 58**
Vessel's hatchcovers are watertight and are constructed according to Russian registered regulations for container ships.

**Clause 59**
Any time lost, either in port or at sea, deviation from the course of the voyage or putting back whilst on voyage caused by sickness of or any accident to the crew or any person on board the vessel other than persons travelling upon request of the Charterers or by reason of the refusal of the Master or crew to perform their duties or due to an accident or breakdown to the vessel, the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until the vessel is again efficient in the same or equivalent position whichever is the shorter distance to the port where the vessel is originally destined and the voyage resumed therefrom. All expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

In the event of loss of time arising from arrest, government restrictions or boycott of the vessel by shore labours and/or tugboats etc. by reason of vessel's flag or the terms and conditions on which crew members are employed or by reason of the trading of this or any other vessel under the same Ownership and/or operation and/or control, payment of hire shall cease for the time thereby lost. Extra proven expenses, if any, resulting from such action to be for Owners' account.

4

Exhibit 1
Page 25

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA "
DATED NEUILLY, 24th NOVEMBER 2006

### Clause 60

Should the vessel be arrested before or during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel, or by any other default of the Owners, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as the result of such arrest and the Owners shall reimburse to the Charterers all proven and directly related expenditure which they may incur under this Charter Party in respect of any period during which by virtue of the operations of this Clause no hire is payable unless arrest is caused by Charterers or their servants' failure.

### Clause 61

In the event of the vessel being denied or restricted in the use of ports and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance because of the vessel's flag or Ownership or management or the wages or conditions of employment of her Officers and/or crew or of the Officers and/or crew of any other vessel under the same Ownership and/or management or because of the previous trading of the vessel or any other vessel as aforesaid, the hire shall cease for the time thereby lost and the Owners shall be responsible for and shall promptly reimburse Charterers all extra expenses which Charterers may incur in trying to solve the situation (including proceeding to an alternative port or ports).

### Clause 62

The vessel shall be off-hire during any time lost on account of vessel's non-compliance with government and/or state and/or provincial regulations pertaining to water pollution.

Owners guarantee that the vessel is covered under standard Protection and Indemnity Club pollution insurance. The Owners have to establish and/or maintain financial security or responsibility in respect of oil or other pollution damage up to the maximum recoverable Protection and Indemnity coverage and to provide and furnish any certificates to authorities to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party. Should any delay to the vessel or any extension to the voyage occur from failure to comply with the above or other rules, regulations, legislation related to pollution and provided Owners have been timely informed of any changes in the trade pattern of the vessel, the vessel to be considered off hire for period of such delay or extension and Owners will pay extra expenses resulting from such failure.

Vessel has on board such certificates of financial responsibility. Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage above Protection and Indemnity cover to enable the vessel to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter Party.

5

Exhibit 1
Page 26

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "ANL KOKODA"
## DATED NEUILLY, 24th NOVEMBER 2006

**Clause 63**
All pilotage(s) expenses to be for Charterers' account except sea pilotage(s) when not compulsory, unless Master deemed it necessary to take pilots for safe manoeuvring in which case same to be for Charterers' account.

For normal husbandry matters Owners' option to use Charterers' agents at different ports of call free of charge but for special cases such as dry docking, change of crew, General Average, etc. Owners to appoint their own protecting agent or to use Charterers' agent against payment of extra agency fee as per tariff.

**Clause 64**
It is understood that only boatage for Charterers' business to be for Charterers' account. All other boatage to be for Owners' account.

**Clause 65**
The Master is to keep a record of all Charterers' gear, equipment, dunnage and/or stores supplied to the vessel and to maintain same in good condition. Such gear, equipment, dunnage and/or stores to be redelivered to Charterers prior to redelivery of the vessel to Owners or, if requested by Charterers, at any time during the period of the Charter, in like good order and condition as supplied (fair wear and tear excepted). Owners to make good any shortage and/or damage unaccounted for. ·

**Clause 66**
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed (including I.L.O. Convention No.32 Part 9 Safety and Health Regulations of Longshoring) and Owners are to ensure that the vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' agents to comply with aforesaid regulations, or because vessel is not in possession of such valid and up-to-date certificates of efficiency, any delay resulting therefrom shall be for Owners' account and Owners to pay all extra expenses incurred incidental to and resulting from such failure, and hire shall cease until vessel is in a position to comply with aforementioned regulations.

**Clause 67** – Deleted

**Clause 68**
Should the vessel be off-hire for more than 15 (fifteen) consecutive days, the Charterers have the option to cancel the Charter Party without further notice. The vessel shall then be redelivered free of cargo. The Charterers have the option to add all or part of the off-hire period to the initial Charter period. The Charterers have the option to add all or part of the off-hire periods to the initial charter period.

6

Exhibit 1
Page 27

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA "
DATED NEUILLY, 24th NOVEMBER 2006

Clause 69
Owners warrant that the date of delivery under this Charter the Vessel shall confirm in all respects with the description attached to this Charter Party. Further, Owners guarantee that speed will not be less and consumption not more as per attached description on Beaufort 3 / Sea State 3 as per description.

Should the Vessel's speed decrease or the consumption increase by 10% or more, the Charterers have the option to cancel the Charter Party and to redeliver the Vessel provided free of cargo.

Clause 70
Charterers to have the right to load dangerous cargo in containers up to a maximum of 1000 (one thousand) metric tons provided same is packed, labelled, loaded, stowed, carried and discharged in accordance with the IMO and local regulations at all ports of call and in strict conformity with vessel's dangerous cargo certificates and to Masters' satisfaction. If extra fittings/lashing is required onboard the vessel for transportation of IMO goods to be for Charterers' account and time. Crew bonus, if required, to be for Charterers' account

Injurious, inflammable, corrosive or dangerous goods to be documented, loaded and stowed and shipping in containers only according to vessel's documents, IMO rules and regulations issued by the respective port authorities. Permitted cargoes are any lawful cargoes in containers including tank-, bulk, gp-, open top, half height, platform-, reefer-flat-, and bolster-containers. Documents relating to hazardous goods to be delivered on board the vessel prior commencement of loading same. For goods if IMDG Code Classes 1, except 1.4S and 7 except schedules 1-5, Owners' prior approval to be obtained which not to be unreasonably withheld. Chemical wastes are always excluded. With regard to the allowed dangerous cargo it is agreed that any possible extra insurance and any special safety equipment required by local law or regulations to be provided and paid for by Charterers. Without prejudice to the generality of the foregoing, in addition, the following are specifically excluded: livestock of any description, arms, ammunition, explosives, sulphur in bulk, pitch in bulk, salt in bulk, ammonium nitrate in bulk, calcium hypochlorite, logs, creosoted goods, scrap including motor blocks and turnings, bauxite, direct reduced iron ore, toxic and/or chemical waste, hot briquetted iron, war/warlike material, radioactive products (except for medical purposes), nuclear material and/or waste also excluded but Charterers have the option to ship arms, ammunition, subject Owners' prior approval which not to be unreasonably withheld.

Clause 71
Owners guarantee vessel is entered and shall remain in a Protection and Indemnity Association for the whole duration of the Charter Party.

Owners P & I Club is          : American Club

Hull and Machinery Value is :

7

Exhibit 1
Page 28

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA "
DATED NEUILLY, 24th NOVEMBER 2006

Charters to have to insure the vessel during the entire Timecharter period of Charterers risk and liability.

Charterers P & I Club is        : Steamship Mutual

**Clause 72**
Should Charterers discharge or instruct Master to discharge a container at another port than mentioned in the Bill of Lading, Owners/Master to be kept harmless/fully indemnified against any liability and/or any consequences whatsoever arising therefrom and the Charterers to provide a Letter of Indemnity in Club form for the purpose.

**Clause 73**
Securing of cargo inside containers and/or flats and other unit loads to be entirely Charterers' concern and responsibility. Any damage to the ship, her tackle, apparel, furniture or else resulting from insufficient lashing/securing of cargo in or on such loads to be repaired at Charterers' expense.

**Clause 74**
Whenever possible, Charterers or their agents to furnish Master with shipper's declared weights for containers. Charterers to be responsible for any consequences, delays and expenses as may arise in port or at sea from lack of container weights and/ or discrepancies between manifest and actual container weights.

**Clause 75** – Deleted

**Clause 76**
Any lashing material which is lost or damaged during the period of this Charter shall be repaired or if necessary replaced by Owners/crew. For repairs/replacement of lashing material Charterers to compensate Owners with lumpsum US$ 650 (six hundred fifty US dollars) per 30 (thirty) days or pro rata together with their regular hire payments.

**Clause 77** – **ISPS Clause For Time Charter Parties**
(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

8

Exhibit 1
Page 29

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "ANL KOKODA "
## DATED NEUILLY, 24th NOVEMBER 2006

<u>Clause 77 – ISPS Clause For Time Charter Parties</u> -continued

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/ Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision.

> "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

9

Exhibit 1
Page 30

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA"
DATED NEUILLY, 24th NOVEMBER 2006

Clause 78 -- Description

M/V  ORIENT SPIRIT EX STAR ISLAND

BUILT        : 1995  JAPAN
FLAG         : ST.VINCENT & GRENADINES
PORT OF REGISTRY  : KINGSTOWN
TYPE         :   CONTAINER CARRIER
IMO No.    : 9117777
CALL SIGN  :
OFFICIAL No.:
GMDSS AREA : A1,A2,A3
OWNERS       : ORIENT SPIRIT NAVIGATION LTD
MANAGERS     : BALTHELLAS CHARTERING S.A.
CLASS        : RUSSIAN REGISTER OF SHIPPING (I.A.C.S)
H & M VALUE :
P & I CLUB   : AMERICAN CLUB
TELEX No.    :
TEL. No.     :
FAX. No.     :
GENERAL DIMENSIONS
HOLDS 4 HOLDS /6 HATCHES AND  UPPER DECK HATCH COVER STEEL
PONTOON WITH
LONGIDUTINAL JOINT IN WAY OF NO2 NO6 HATCH
LENGTH OVERALL   115.02m
LENGTH BETWEEN P.P.   105.99m
BREADTH MOULDED   18.20 m
DEPTH MOULDED    11.00 m
SUMMER DRAUGHT    8.00 m
D.W.T AT SUMMER DRAFT   8712.59  kt
LIGHT WEIGHT   3,481.41KT
DRAFT DISPLACEMENT   12,194.00KT

TONNAGE:
GRT       6384
NRT       3340

CLASSIFICATION
CLASS        : RUSSIAN REGISTRY OF SHIPPING

STACK WEIGHTS

TANK TOP                  20 FT: 4 TIERS   ( 60LT /
STACK)
NO1 SIDE STR              20 FT: 3 TIERS   (45LT/
STACK)
NO2 SIDE STR              20 FT: 2 TIERS   (30LT/
STACK)

10

Exhibit 1
Page 31

### RIDER CLAUSES TO CHARTER PARTY OF
### M.V. "ANL KOKODA "
### DATED NEUILLY, 24th NOVEMBER 2006

| | | |
|---|---|---|
| 2ND DECK | 20 FT : 1 TIERS | (15LT/STACK) |
| UPPER DECK | 20 FT : 3 TIERS | (45LT/STACK) |
| PONTOON HATCH COVER | 20 FT : 2 TIERS | (40LT/ STACK) |
| | 40 FT : 2 TIERS | |

(60 LT/ STACK)

| | | |
|---|---|---|
| TANK TOP | 40 FT : 3 TIERS | (120LT/ STACK) |

CONTAINERS INTAKE

| TEU CAPACITY | ON DECK | 260 TEU |
|---|---|---|
| | IN HOLD | 230 TEU |
| | TOTAL | 490 TEU |
| FEU CAPACITY | ON DECK | 70 FEU |
| | IN HOLD | 106 FEU |
| | TOTAL | 176 FEU |

CELL GUIDE FITTED

FEU CAN BE LOADED ONLY IN : BAYS   04( 03-05) > 16 PCS , BAY 08> 24 PCS ,

BAYS 12 ( 11/13) > 24 PCS,  BAYS 16 (15/17) > 24 PCS,  BAY 20 (19/21) > 28 PCS

HIGH CUBES CONTRS  CAN BE LOADED  IN BAYS : 4> 12 PCS , 8 > 18 PCS
12 > 18 PCS , 16 > 18 PCS,  20 ,> 6 PCS

FITTED  FOR THE CARRIAGE OF DANGEROUS GOODS IN HOLD /DECK IN
PACKED CONDITION ACCORDING TO SOLAS REG II -2 /53,54 OF SOLAS 74
AS AMENDED

TYPE OF HATCH COVER

1) PONTOON TYPE
   1 PANEL PER ONE HATCH (NO.1 HATCH )
   2 PANELS PER ONE HATCH (NO2 - 6 HATCH )

2) CLEATING     :DOG BOLT ( MANUAL  CLEAT )
   (AROUND COAMING )

3) LIFTING UP/DOWN :BY 20 OR 40FT CONTAINER SPREADER

11

Exhibit 1
Page 32

### RIDER CLAUSES TO CHARTER PARTY OF
### M.V. "ANL KOKODA"
### DATED NEUILLY, 24th NOVEMBER 2006

SPEED & CONSUMPTION

SPEED AND CONSUMPTION PER DAY WITHOUT ANY REEFER CONTAINER
      KNOTS     LADEN
ABOUT 14.00    ABOUT 17.0MT FO ABOUT 1.5 MT DO
ABOUT 13.50    ABOUT 16.5MT FO ABOUT 1.5 MT DO
ABOUT 13.00    ABOUT 16.0MT FO ABOUT 1.5 MT DO

ALL ABOVE SPEED/CONSUMPTION FIGURES ARE ABOUT AND
CALCULATED, EVEN KEEL ,DEEP AND CURRENTLESS WATER /SEA ,WIND
MAX,BEAUFORT 3 AND SEA NOT EXCEEDING DOUGLAS SEA STATE 3 AND
MAX SEA TEMPERATURE 28C.

ALWAYS EXCLUDING CONSUMPTION FOR REEFER CONTAINERS,
FULL REEFER CONTAINER LOAD IN TOTAL DO AT SEA ABOUT 4 MT PER
DAY AND ABOUT 1.5 MT PER DAY IN PORT

IN PORT CONSUMPTION PER DAY WITHOUT ANY REEFER CONTAINERS
SHIP'S GEAR WORKING :FO ABOUT 1.0MT / DO ABOUT 2.5 MT
WITHOUT USING SHIP'S GEAR : FO ABOUT 1.0MT / DO ABOUT 1.5 MT

REEFERS CAPACITY
VSL HAS 100 TEU REEFER POINTS ON DECK
REEFER POINTS: 100TEU ,VOLTAGE 440 V /32 A ON DECK

CARGO GEAR
36T X 22MX 2 STES (EACH GEAR 360 DEG TURNING)
CARGO GEAR LOCATION : BETWEEN NO.1 HOLD & NO.2 HOLD
                      BETWEEN NO.3 HOLD & NO,4

HOLD

STABILITY PROGNOSIS

|  | FO | DO | FW |
|---|---|---|---|
| DEPARTURE | 680.50 T | 90.40 T | 297.00 T. |
| 60PCNT.CONS. | 340.20 T | 45.20 T | 148.50 T |
| ARRIVAL | 68.00 T | 9.00 T | 23.10 T |

REFERENCE OF TRIM CALCULATION FOR CONTAINER LOADING
CONDITION TO BE SHOWED AS FOLLOW NO,1 W.B.T.(P+S)+NO 2. W.B.T.(P+
S ) IS PERMANENT WATER BALLAST TANKS.

12

Exhibit 1
Page 33

### RIDER CLAUSES TO CHARTER PARTY OF
### M.V. "ANL KOKODA "
### DATED NEUILLY, 24th NOVEMBER 2006

A   8T CONTAINER LOADING CONDITION (436 TEU) 3225T - 3345T

B   10T CONTAINER LOADING CONDITION (411 TEU) 2950T - 3345T

C   11T CONTAINER LOADING CONDITION (402 TEU) 2964T - 3345T

D   12T CONTAINER LOADING CONDITION (394 TEU) 2843T - 3345T

E   13T CONTAINER LOADING CONDITION (380 TEU) 2570T - 3225T

F   14T CONTAINER LOADING CONDITION (370 TEU) 2380T - 2963T

G   15T CONTAINER LOADING CONDITION (360 TEU) 2170T - 2003T

H   16T CONTAINER LOADING CONDITION (348 TEU) 1998T - 2682T

I   17T CONTAINER LOADING CONDITION (338 TEU) 1816T - 2422T

J   18T CONTAINER LOADING CONDITION (322 TEU) 1786T - 1867T

K   19T CONTAINER LOADING CONDITION (318 TEU) 1560T - 2214T

L   20T CONTAINER LOADING CONDITION (306 TEU) 1429T - 2053T

M  15T CONTAINER LOADING  CONDITION 230 TEU
     10T CONTAINER LOADING  CONDITION 181 TEU


411 TEU

N  15T CONTAINER LOADING CONDITION   230  TEU
     20T CONTAINER ON HATCH          90  TEU


329 TEU

O  30T CONTAINER LOADING CONDITION  106 TEU
     20T CONTAINER ON HATCH (40CONT)    88 TEU


194 TEU
ALL INTAKES ARE ALWAYS SUBJECT TO VSL'S TRIM STABILITY
DEADWEIGHT PERMISSIBLE LOADING GEAR BREAK LOADS ,CONTAINER
LASHING PLAN AND RANGE OF VISIBILITY.

13

Exhibit 1
Page 34

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "ANL KOKODA "
## DATED NEUILLY, 24th NOVEMBER 2006

TYPE OF ENGINE
MAIN ENGINE: HITACHI B& W 6080 PS X 200 RPM
BUNKERS CAPACITY
TANK CAPACITY (100PCT): IFO 746 M3 DO 108 M3
VESSEL IS BURNING IFO 180

NEXT D/D
21/10/07
NEXT S/S
21/10/09
ADDITIONAL INFORMATION
 1.- VESSEL FITTED WITH BOW THRUSTER
 2.-VESSEL FITTED WITH ALL FIXED AND LOOSE FITTINGS FOR A FULL
    LOADING OF CONTAINERS.
 3.-CO2 FITTED/ SMOKE DETECTION FITTED
 4.-OFFICERS(RUSSIAN NATIONALITY)FLUENT IN ENGLISH
OWNERS CONFIRM VESSEL IS FULLY FITTED TO TRADE AUSTRALIA AND
NEW ZELAND.

ALL DETAILS ABOUT


Clause 79 – Deleted


Clause 80 – Deleted


Clause 81
Notwithstanding anything else contained in this Charter Party all costs or expenses
arising out of or related to security regulations or measures required by any authority
including, but not limited to, security guards, launch services, tug escorts, port security
fees or taxes and inspections, shall be for the Charterers' account, unless such costs or
expenses result solely from any act of default of the Owners and/or crew and/or any of
Owners' servants.

The above does not include physical changes to the vessel, which should be considered
standard and normal on a vessel of this type and Class.

Clause 82 -- Deleted


Clause 83
The Charterers have the right to deduct from the hire payment the Owner's expenses
supported by the relevant vouchers. The Charterers can also deduct from the last hire
payments the bunker's countervalue and the estimated disbursements for Owners'
account.

14

Exhibit 1
Page 35

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "ANL KOKODA "
DATED NEUILLY, 24th NOVEMBER 2006

Clause 84

The vessel shall not be sold during the Charter period without the Charterers' prior approval of the potential new Owners which not to be unreasonably withheld.

Clause 85
Deleted

OWNERS

CHARTERERS

15

Exhibit 1
Page 36

BARRY ROGLIANO SALLES

Neuilly, 13th September 2007

ORIGINAL

**ADDENDUM N°3**
**to the Charter Party dated Paris, the 24th of November 2006**
**of m/v «ANL KOKODA»**

The following has been mutually agreed

Between  Messrs. ORIENT SPIRIT NAVIGATION LTD
         as Owners,
         *on the one part,*

                   *CONTAINER LINE PTY LTD*
and      Messrs. ANL ( Melbourne-Australia)
         as Charterers,
         *on the other part,*

Owner's name - correction

Notwithstanding what is stated in the current charter party and previous addenda, Owners'
name to be **"ORIENT SPIRIT NAVIGATION LTD."**

All other terms, details and conditions to remain in full force as per current Charter Party of
the M/V "ANL KOKODA" dated the 24th November 2006 and previous addenda.

THE OWNERS                                    THE CHARTERERS

1 / 1

Exhibit 1
Page 37

BARRY ROGLIANO SALLES

1st ORIGINAL

<u>Neuilly, the 17th February 2010</u>

---

**ADDENDUM N°7**
**to the Charter Party dated Paris, the 24th of November 2006**
**of M/V ANL KOKODA**

---

Between    Messrs. ORIENT SPIRIT NAVIGATION LTD (Liberia)
           as Owners,
           *on the other part,*

and        Messrs. ANL CONTAINER LINE PTY LTD (Melbourne-Australia)
           as Charterers,
           *on the other part,*

<u>The following has been mutually agreed :</u>

The Vessel will perform a time charter trip to Sydney, of maximum 20 (twenty) days, which to start on dropping outward pilot Chengxi Shipyard (Shanghai) and be finalised upon completion of cargo operations at Sydney at any time day or night, Saturdays, Sundays and holidays included on both ends.

Laycan : 31/01/2010 - 02/02/2010

Hire at USD 1.- per day or pro rata until completion of cargo operations in Sydney or after 20 days sailing from Shanghai. Otherwise terms and conditions as per charter party 24th November 2006 and relevant addenda.

The new period of 6 months +/- 30 days and rate of USD 4200.- (four thousand two hundred US Dollars) per day or pro rata to start either end of cargo operations in Sydney or after 20 days sailing from Shanghai.

---

All other terms, details and conditions of present Charter Party dated the 24th of November 2006 and addenda to remain valid and in full force.

THE OWNERS                                          THE CHARTERERS

BALTHELLAS CHARTERING S.A.
FOR AND ON BEHALF OF THE OWNERS
AS AGENTS

The Common Seal Of

1 / 1

Exhibit 1
Page 38

BARRY ROGLIANO SALLES

*1st* ORIGINAL

Neuilly, the 9th February 2011

---
**ADDENDUM N°9**
**to the Charter Party dated Paris, the 24th of November 2006**
**of M/V ANL KOKODA**
---

Between    Messrs. ORIENT SPIRIT NAVIGATION LTD (Liberia)
           as Owners,
           *on the other part,*

and        Messrs. ANL CONTAINER LINE PTY LTD (Melbourne-Australia)
           as Charterers,
           *on the other part,*

The following has been mutually agreed :

The Vessel has been extended in direct continuation of present charter party, as from 18th February 2011, for a further period of 6 (six) months time charter with in Charterers' option further 6 (six) months time charter with up to 15 (fifteen) days more or less in Charterers' option on final declared period.

The option is to be declared by the Charterers latest 18th July 2011.

Hire rates :        *2nd intetent*
Hire USD 5.925.- (five thousand nine hundred twenty five US Dollars) per day or pro-rata including overtime for the firm period,

Hire USD 7.250.- (seven thousand two hundred fifty US Dollars) per day or pro-rata including overtime for the optional period.

---

All other terms, details and conditions of present Charter Party dated the 24th of November 2006 and addenda to remain valid and in full force.

For and on behalf of the Owners

BALTHELLAS CHARTERING S.A.                          THE CHARTERERS

As Agents

1 / 1

Exhibit 1
Page 40



Exhibit 2
Page 41

Interim Platts for Region: Early Asia
Quote Date:29-Aug-2011

| Quote Name | Low | +/- | High | +/- | Av | Monthly Avg |
|---|---|---|---|---|---|---|
| **Bunkerwire** | | | | | | |
| Fujairah 180 CST | 668.00 | 2.00 | 669.00 | 2.00 | 668.50 | 673.45 |
| Fujairah 380 CST | 659.00 | 1.50 | 660.00 | 1.50 | 659.50 | 664.70 |
| Fujairah Marine Diesel Oil | 1,062.00 | 8.00 | 1,063.00 | 8.00 | 1,062.50 | 1,048.45 |
| Japan 180 CST | 713.00 | 2.00 | 714.00 | 2.00 | 713.50 | 715.60 |
| Japan 380 CST | 705.00 | 2.00 | 706.00 | 2.00 | 705.50 | 708.52 |
| Japan Marine Diesel Oil | 993.50 | 8.00 | 994.50 | 8.00 | 994.00 | 975.60 |
| Shanghai 180 cst dlvd | 688.00 | 2.50 | 689.00 | 2.50 | 688.50 | 692.78 |
| Shanghai 380 cst dlvd | 675.50 | 2.50 | 676.50 | 2.50 | 676.00 | 670.30 |
| Shanghai Marine Gasoil dlvd | 1,084.00 | 5.00 | 1,085.00 | 5.00 | 1,084.50 | 1,079.10 |
| Singapore 180 CST | 668.50 | 2.50 | 669.50 | 2.50 | 669.00 | 663.38 |
| Singapore 380 CST | 661.50 | 2.00 | 662.50 | 2.00 | 662.00 | 656.63 |
| Singapore Marine Diesel Oil | 961.00 | 8.00 | 962.00 | 8.00 | 961.50 | 951.73 |
| Singapore Marine Gasoil | 966.00 | 8.00 | 967.00 | 8.00 | 966.50 | 956.73 |
| South Korea 180 CST | 677.00 | .00 | 678.00 | .00 | 677.50 | 680.80 |
| South Korea 380 CST | 670.00 | .00 | 671.00 | .00 | 670.50 | 673.53 |
| South Korea Marine Diesel Oil | 969.00 | 6.00 | 970.00 | 6.00 | 969.50 | 964.70 |
| S'pore Ex-Wharf 180 CST | 666.50 | 2.50 | 667.50 | 2.50 | 667.00 | 661.38 |
| S'pore Ex-Wharf 380 CST | 659.50 | 2.00 | 660.50 | 2.00 | 660.00 | 654.63 |
| | | | | | | |
| **Singapore** | | | | | | |
| HSFO180 S'Pore Crgo | 660.80 | 2.24 | 660.84 | 2.24 | 660.82 | 652.55 |
| HSFO380CST4% S'pore CrgSpt Dly | 653.68 | 1.78 | 653.72 | 1.78 | 653.70 | 645.94 |
| | | | | | | |
| **Arab Gulf** | | | | | | |
| HSFO 180 CST Fob Arab Gulf | 646.51 | 2.37 | 646.55 | 2.37 | 646.53 | 637.55 |
| HSFO 380 CST 4% FOB AG | 639.39 | 1.91 | 639.43 | 1.91 | 639.41 | 630.95 |

Exhibit 3
Page 42

NO/76TT.

# BALTHELLAS CHARTERING S. A.
### Monrovia, Liberia

31/8/2011

To:   A N L

> **PRE-FINAL  HIRE  INVOICE**
> **m/v "ANL KOKODA" ~ T/C 18/10/2006**
> **Period: 13/7/2011-23:00 Gmt TILL 30/8/2011-02:00 GMT**

| | | |
|---|---|---|
| 47 Days + 3 Hrs X US$ 5.717,63 (Net) | $ | 269.413,69 |
| P L U S : | | |
| Lashing Materials + C/E/V for the above period | $ | 3.446,51 |
| | $ | 272.860,20 |
| L E S S : | | |
| Amount received on 14/7/2011 | $ | 14.271,42 |
| BUNKERS ON REDELIVERY: | | |
| IFO-180CST 291,83 Mtns X US$ 669,00 | $ | 195.234,27 |
| MGO 19,03 X US$ 966,50 | $ | 18.392,50 |
| Estimated Owners Items ~ if any ~ | $ | 10.000,00 |
| Amount due | $ | 34.962,01 |
| | | E. & O. E. |

Above amount is to be remitted discountless, as follows to:

HSBC BANK PLC.,
93 AKTI MIAOULI
PIRAEUS BRANCH,
GREECE
SWIFT : MIDLGRAA
IN FAVOUR OF : BALTRADE SHIPPING S.A.
IBAN:  GR17 0710 0010 0000 0103 1491 036



(26)

Exhibit 4
Page 43

Page 1 of 2

mmc-gnh@hol.gr                                                                                11/5/2011

From:       "Panos Zafet" <paz@hellasco.gr>
To:         <liner@brsbrokers com>
Sent:       Friday, March 11, 2011 12:49 PM
Subject:    mv anl kokoda

Dear Guillaume,

As advised the vessel has been committed to be sold to messrs. PT Jayakasuma Perdana Lines of
Indonesia.
Buyers have approved the applicable t/c with ANL and relevant optional period.

Herebelow plse find buyers' back-ground as provided to us :

quote

The company was founded in 1986. Its shipping activities started as
main agent to Evergreen in Indonesia and then grew into shipowning and
later also inter island liner service.

Under own ownership the company has had upto 4 vsls from 460 teu to
1210 teu. 2 of their owned vessels have been on tc to PDZ (Perkapalan
Dai Zun SDN. BHD. Malaysia), Evergreen Marine Corporation, Taiwan and
Kanway Shipping Limited, Taiwan for periods upto 4 years.

The company manages its vessels both technically and commercially
inhouse.

Their full style is:

Pt Jayakusuma Perdana Lines
Jl. Hr. Rasuna Said Kav.C 3
10th Floor
Jakarta 12920
Indonesia

Unquote

Plse let us have charterers' approval of above mentioned buyers to conclude sale M.O.A.
In accordance to governing c/p clause 84.


Brgrds,
Balthellas Chartering S.A., Tel. 302109406900, fax 302109406933, email : chartering@hellasco.gr


5/25/2011

Exhibit 5
Page 44

-----Original Message-----
From: Sam Chambers [mailto:snp@howerobinson.com]
Sent: Thursday, March 03, 2011 2:31 PM
To: chartering
Subject: anl kokoda - recap

*3/3/9c 11*

HOWE ROBINSON SHIPBROKERS - SnP Dept.

E-mail: snp@howerobinson.com
SC99911439  03/03/2011  12:30:34

Panos/Sam
ANL Kokoda

Many thanks for your confirmation. Please find below recap:

Buyers:  A company to be nominated by PT Jayakusuma Perdana Lines
Sellers: Orient Spirit Navigation

Vessel: ANL Kokoda, IMO No 9117777

1. Price: US$ 7,300,000 less 1.5 pct ttl commission

Deposit of 10 percent of the purchase price  to be placed into a
joint interested bearing account in the names of the Sellers and the
Buyers with Sellers nominated bank within 3 banking days after the MOA
is signed by both parties by fax and all subjects are lifted, interest
to be credited to Buyers account at the time of delivery. Any fees
charged for opening/lodging/holding said deposit to be born equally by
the Sellers and Buyers. 10 percent deposit to be released and balance
90 percent purchase money to be paid to sellers at time of vessel's
delivery and in exchange of delivery of documents.

2. Buyers have inspected the vessel in Brisbane and this offer is
clean and outright subject only the terms of the MoA

4/14/2011

Exhibit 6
Page 45

Page 5 of 6

3. The vessels shall be delivered with her present charter to ANL at usd 5925 per day less 4.75% til August 2011 ,charterers option 6 mos at usd 7250 less 4.75% (please advise exact laycans) clean holds, safely afloat, free of encumbrances, free of stowaways and free of maritime liens, mortgages or any other taxes, debts or claims whatsoever.

The Vessels to be delivered safely afloat at a mutually agreed safe berth or buoy or anchorage in vessels present trading area, Oz - Papua range between 15th March and 15th April 2011 in Sellers option

Sellers to keep buyers closely informed of vessel's schedule and to give 20/10/7/5/3/1 days approximate notice of the date of the estimated delivery.

4. Vssl to be delivered in substantially same condition as when inspected, fair wear and tear excepted, free of recommendations/conditions with valid class docs for 3 months

5. No drydocking. Buyers have the right to perform a Diver's inspection prior to delivery

if any damage is found to the rudder, propeller, bottom or other underwater parts below the deepest load line which in the opinion of class would impose a class condition, but does not affect vessel's ability to trade until next scheduled drydocking, Buyers and Sellers shall agree to an amount of compensation to be deducted from the purchase price and Buyers shall accept delivery of the vessel including the condition(s) raised by the divers inspection.

If Sellers and Buyers cannot agree a compensation figure within 1 working day, then the figure to apply is to be the average quotes of estimated costs of repairs obtained from 2 first class yards, one appointed by the Sellers and one appointed by the Buyers. Compensation is to be the direct actual costs of repairs excluding drydock time, services and off-hire.

6. The vessels shall be delivered and taken over with everything belonging to her on board/ashore/on order at the time of delivery including all radio and navigational aids, all spare parts and spare equipments including broached/unbroached stores, provisions and used/unused spares as on board at time of delivery.

Excluded from the sale are master's/officers/crew's personel belongings and following hired items:

7. Buyers to pay extra for remaining lubricating oils in unbroached drums and designated storage tanks at sellers last net paid prices as evidenced by vouchers/suppliers invoices. Bunkers are charterers property and to be dealt with as per present c/p

8. Buyers are to have the right to place onboard up to maximum of two(2) representatives after the deposit has been lodged and until delivery as observers for familiarisation purposes only without interference of the vessel's operation at buyers risk and expense. Representatives to sign Sellers normal indemnity form.

9. Sellers to supply documentation which may be reasonably required for the legal transfer of the vessel and for her registration under new flag and ownership Documentation to be agreed simultaneously with

4/14/2011

Exhibit 6
Page 46

the MOA.

10. Sellers to guarantee that to the best of their knowledge the vessel is not blacklisted.

11. All instruction books, drawings, plans and manuals, onboard or ashore in owners/managers office that are in sellers possession are to be delivered to the Buyers. Owners to forward office set as soon as possible after delivery to Buyers nominated office. All forwarding costs to be for Buyers account.

12. Closing and exchanging of documents to be held in Sellers Bank, Piraeus.

13. Arbitration London with English law and LMAA rules to apply.

14. Otherwise contract to be based on NSF 93 suitably amended to incorporate the above terms and conditions

15. Negotiations and sale, if any, to be kept strictly private and confidential.

16. Subject Buyers approval of c/p with ANL which will be provided after main terms agreed. Subject to be lifted within 3 days of recieving c/p.

Subject Charterers approval of Buyers and  conclusion of tripartite agreement.

17.  Will advise Charterers of the intended sale and approval of the buyers, after which we will ask Charterers to provide us the information that is required to approve the intending buyers.

End Offer
++++++++++

KIND REGARDS
BALTHELLAS CHARTERING SA



Exhibit 6
Page 47

Page 1 of 1

mmc-gnh@hol.gr                                                    31/3/2011

| From: | "Panos Zafet" <paz@hellasco.gr> |
|-------|--------------------------------|
| To: | <liner@brsbrokers.com> |
| Cc: | "Takis Nikoletos" <niko@hellasco.gr>; "Simon Zafet" <saz@hellasco.gr> |
| Sent: | Tuesday, March 22, 2011 5:50 PM |
| Subject: | ANL Kokoda |

Guillaume plse,

-As per our telcon. of this morning we are still waiting for charts' response to our mail regarding the approval of new buyers by the charts (our mail of 11th March, 2011)

-We are also awaiting charts' reaction in respect to owns' proposal for an amicable settlement of the pending claim regarding crane damage at Pt. Moresby in July '10 (our mail of March 16th, 2011)

Presume charts have had enough time to consider these matters and their prompt reaction is of paramount importance.

Brgrds,
Balthellas Chartering S.A., Tel. 302109406900, fax 302109406933, email :
chartering@hellasco.gr

_____ NOD32 5953 (20110314) Information _____

This message was checked by NOD32 antivirus system.
http://www.eset.com

5/25/2011

Exhibit 7
Page 48

mmc-gnh@hol.gr

| From: | "Panos Zafet" <paz@hellasco.gr> |
| To: | <liner@brsbrokers.com> |
| Cc: | "Takis Nikoletos" <nlko@hellasco.gr>; "Simon Zafet" <saz@hellasco.gr> |
| Sent: | Wednesday, March 30, 2011 6:14 PM |
| Subject: | RE: ANL KOKODA |

Guillaume plse,

Strictly without prejudice

Ref to our earlier phone-conv. and your suggestion Balthellas would agree to cover the claim by ANL in respect of their alleged damages resulting from the breakdown by the stevedores of the crane in July 2010.
As discussed this is on a strictly without prejudice basis and without prejudice to the claim by the owners of the vessel for damage to the crane by stevedores appointed by ANL & any consequential loss such as an eventual failure of vessel's sale should the chrts not lift their approval of new buyers.

Balthellas is prepared to guarantee the payment of any amount awarded to ANL in an arbitration of the above dispute.
It is understood that the guarantee would be a letter of undertaking by Balthellas to ANL in a wording which to be mutually agreed.

B.Regards, Balthellas Chartering S.A., Tel. 302109406900, fax 302109406933, email : chartering@hellasco.gr

_____ NOD32 5953 (20110314) Information _____

This message was checked by NOD32 antivirus system.
http://www.eset.com

5/25/2011

Exhibit 8
Page 49

Page 1 of

## mmc-gnh@hol.gr

From:       <mmc-gnh@hol.gr>
To:         "Takis Nikoletos" <niko@hellasco.gr>
Sent:       Thursday April 14, 2011 1:51 PM
Subject:    Re: M/V ANL KOKOKA / ANL CONTAINER LINES

SUGGEST FOLLOWING TO THE CHRS

QUOTE

U R G E N T

WITHOUT PREJUDICE

MV ANL KOKODA / MOA

WE REFER TO THE ABOVE MATTER AND TO OUR REQUEST FOR PARTICULARS OF THE CLAIM TO
WHICH WE HAVE NOT RECEIVED A REPLY.

IN THE MEANTIME WE HAVE TAKEN UP THE MATTER WITH OUR P&I CLUB AND THEY CONFIRM THAT
THEY WILL PROVIDE AN LOU TO THE CHRS AGAINST A CASH DEPOSIT TO THE CLUB FROM THE
OWNERS.

WE TRUST THIS IS ACCEPTABLE AND PLEASE, AS A MATTER OF URGENCY, LET US HAVE A
BREAKDOWN OF CHRS CLAIM AND WHAT SUPPORTING DOCS CHRS HAVE.  PLEASE LET US ALSO
HAVE A DRAFT OF THE LOU WHICH IS TO BE PROVIDED BY THE P&I CLUB PAYABLE AGAINST AN
ARBITRATION AWARD AND/OR AGREEMENT BETWEEN THE PARTIES.

ON RECEIPT OF THE ABOVE WE SHALL ASK THE CLUB TO NOMINATE AN ARBITRATOR WHICH YOU
CAN THEN ACCEPT AS SOLE ARBITRATOR OR APPOINT CHRS ARBITRATOR IN THIS REFERENCE

A COPY OF THE COMMUNICATION FROM THE CLUB:
IS ALSO ATTACHED FYG.

Exhibit 9
Page 50

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| ORIENT SPIRIT NAVIGATION LIMITED | ANL CONTAINER LINE PTY LIMITED |

| (b) County of Residence of First Listed Plaintiff   Liberia<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)* |
|---|---|

| (c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.<br>Bradley M. Rose/Andre M. Picciurro<br>KAYE, ROSE & PARTNERS, LLP<br>1801 Century Park East, Suite 1500, Los Angeles, CA 90067 | Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding  ☐ 2. Removed from State Court  ☐ 3. Remanded from Appellate Court  ☐ 4. Reinstated or Reopened  ☐ 5. Transferred from Another District (Specify)  ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT:** $ 1,251,499.44

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Breach of Maritime Contract pursuant to 28 U.S.C. Section 1333

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☒ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 443 Housing/ Accommodations | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

| FOR OFFICE USE ONLY: | Case Number: | CV14-0572 | |
|---|---|---|---|
| CV-71 (11/13) | | CIVIL COVER SHEET | Page 1 of 3 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| [ ] Yes  [X] No | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |

**C.1. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____   DATE: January 23, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Percy Anderson_____ and the assigned

Magistrate Judge is _____Jacqueline Choolijian_____ .

The case number on all documents filed with the Court should read as follows:

## 14-cv-00572 PA-JCx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____January 24, 2014_____
Date

By  SBOURGEOIS_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

## Subsequent documents must be filed at the following location:

[x] Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

[ ] Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

[ ] Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**